[Civ. No. 2148.   Fourth Appellate District.—June 15, 1938.]

CORA B. YOUNG, Respondent, v. THE YOUNG HOLDINGS CORPORATION, LTD. (a Corporation) et al., Appellants; P. E. KEELER, as Special Administrator, etc., Intervener and Respondent.

W. I. Gilbert for Appellants.

James W. Bell and P. E. Keeler for Respondents.

MARKS, J.—Plaintiff brought this action against defendants seeking a decree (1) compelling defendants to reconvey to her certain described properties of her own estate in the California counties of Los Angeles and Orange and in the state of Oklahoma, and certain described properties or interests therein formerly belonging to the estate of Charles Sumner Young, deceased, in the county of Kern in California; (2) requiring defendants to account to her for moneys received from property formerly belonging to the estate of Charles Sumner Young, and her own properties; (3) quieting title to the real properties or her interest therein; (4) appointing a receiver to collect rents and profits from the real estate; (5) for interest on moneys due her; (6) for general relief.

The complaint in intervention sought practically the same relief as did the third amended complaint, except that it was confined to properties formerly belonging to the estate of Charles Sumner Young, deceased. Pending this appeal, P. E. Keeler, as special administrator of the estate of Henry J. Young, was substituted in the place and stead of Alpha Alpheus Mosher as the executor of the estate of Henry J. Young, deceased.

After a protracted trial the trial court found that defendants had conspired together to defraud, and had defrauded, plaintiff and intervener out of the Kern County property, and had conspired to defraud, and had defrauded, plaintiff out of her properties in Los Angeles County, Orange County and in the state of Oklahoma. It was adjudged that defendants held a 21-and-11/15 per cent interest in the Kern County property and all the other property in trust for plaintiff, and an 18-and-11/15 per cent interest in the Kern County property in trust for the estate or heirs or devisees of Henry J. Young. Defendants were ordered to reconvey the respective interests of plaintiff and intervener to them and their interests therein were quieted. A money judgment was rendered in favor of plaintiff in the sum of $13,809.95, and in favor of intervener in the sum of $11,895.15. Defendants have appealed from the whole of the judgment.

We find no reference in the briefs to the portion of the judgment dealing with the Oklahoma property of plaintiff. We therefore conclude that defendants' have abandoned this portion of their appeal and we will give it no further attention.

The case is before us on a bill of exceptions containing eight hundred fifty-six pages. The voluminous record deals with events beginning in 1925 and ending at the time of the trial in 1936. We cannot review all of the evidence in detail within the limits of this opinion. As the trial court accepted the evidence presented by plaintiff and intervener as true, we will confine our statement of facts to as brief a review as possible of those portions of the evidence supporting the findings and judgment. The statement of facts naturally divides itself into two parts, the one dealing with the Kern County property formerly belonging to Charles Sumner Young, and the other, dealing with the properties in the counties of Orange and Los Angeles, belonging to plaintiff. It should be observed, however, that the truth of many of the facts which we will state as proved, together with many of the inferences and conclusions the trial judge drew from them, are disputed by the defendants.

Charles Sumner Young died in September 1925, leaving surviving him as heirs at law, Henry J. Young, his brother, since deceased; Alice L. Fisher, his sister, since deceased; Jessie Fremont Young, his sister, since deceased, and plaintiff, Cora B. Young, his sister. He left a will, which, after bequeathing relatively small sums to his brother and three sisters, left the major portion of his estate to the Clara Barton Sequoyah Foundation, a charitable corporation which had as its avowed purpose, assistance to and relief of the American Indian. As the will was executed less than thirty days prior to the death of the testator the bequest to charity failed. We will refer to the corporation as the Foundation.

The estate of Charles Sumner Young consisted of over fourteen hundred acres of land in Kern County. After his death oil was developed on part of it and much of the balance is prospective oil-bearing land so the estate has become very valuable.

Various negotiations were carried on between the Foundation and the heirs at law. These are not particularly important here except to show that plaintiff, and at least one of the other heirs, were much interested in the purpose of aid-

ing the American Indian, expressed in the will of Charles Sumner Young, and were willing to give up large portions of their inheritances to accomplish this purpose. After the will was admitted to probate, part of the Kern County property was leased to the General Petroleum Corporation for development for oil production. A large bonus was paid in cash and substantial royalties were to be paid out of production. A partial distribution was had of the sum of $120,000. By various conveyances the property of the estate finally found its way into a trust with the Security Trust Company of Bakersfield as trustee and the brother and three sisters and their assignees as beneficiaries.

Defendants James D. Young, Georgia Lee Young, his mother; Mildred Hanna and William E. Hanna, her husband, were relatives of the deceased, either by blood or by marriage, but not heirs at law. A. C. Routhe, named in the title as A. G. Routhe, an attorney at law, was at different times, and in other litigation, attorney for the various parties to this action, even when their interests were conflicting. The Young Holdings Corporation, Ltd., was a corporation organized by the individual defendants for the purpose of taking title to the property of the estate of Charles Sumner Young, deceased.

The evidence shows that James D. Young, Georgia Lee Young, Mildred Hanna and William E. Hanna appeared in the estate picture in 1929. On April 20th of that year Georgia Lee Young (the mother of James D. Young) wrote a bank in Bakersfield advising it to pay no more of the estate money to the Foundation.

On May 15, 1929, Alice L. Fisher executed a power of attorney to James D. Young authorizing him to act for her in protecting her interest in the estate of her brother, Charles Sumner Young. In May, 1929, James D. Young went to Los Angeles and contacted plaintiff and discussed with her the advisability of recovering her interest in the estate of her brother. His solicitations and protestations of family affection resulted in plaintiff executing a power of attorney dated June 7, 1929, authorizing him to act for her in the estate matter. Again, at the solicitation of James D. Young, plaintiff assigned to him two-fifths of her interest in the undistributed property of the estate in consideration for his services in recovering her interest for her. He agreed to employ and pay attorneys to represent her. He also secured a similar

power of attorney and assignment of interest from Henry J. Young under date of July 26, 1929.

On June 14, 1929, Alice L. Fisher assigned a two-fifths part of her interest in the estate of her brother, Charles Sumner Young, to James D. Young, who agreed to pay all attorneys' fees and court costs in connection with the recovery of her interest in the estate. Jessie Fremont Young executed a similar contract.

During these negotiations, plaintiff, and perhaps some of the other heirs at law of Charles Sumner Young, strongly expressed a desire to carry out the intentions of the deceased to have the larger part of his estate used for the aid of the American Indian. The defendant relatives seemed to have concurred in this desire and promised to carry it into effect, and in addition to protestations of affection, used this as one of the means of securing the documents we have mentioned. In execution of these plans James D. Young prepared a letter, addressed to the trustees of the Foundation, which was signed by plaintiff. This letter was dated October 23, 1929, and contained the following:

"This communication will be brought to you by members of the Young family, in whom both you and myself as well as the other heirs of Charles Sumner Young should have the utmost confidence. They will convey to you my attitude toward and plans for the Foundation, and the carrying out of these plans will be largely left in their hands, under my supervision, with the assent of my brother and sister.

"It must be borne in mind, however, that any plans for the Foundation which are now contemplated by us are dependent for their success upon the attitude of the Foundation itself at this time, and for this reason the full co-operation of the Foundation must be had, as will be explained by the bearer of this message. . . . "

On November 8, 1929, the Foundation conveyed all of its interest in the estate to the heirs of Charles Sumner Young. On December 9, 1929, James D. Young, acting under the several powers of attorney, without consideration, conveyed the interests of plaintiff, of Henry J. Young, and of Alice L. Fisher in the estate property to defendant Georgia Lee Young, his mother. In the meantime Jessie Fremont Young had died. James D. Young filed her will for probate in the superior court of Kern County. Letters of administration with the will annexed were isued to him on April 7, 1930.

On April 14, 1930, a decree of final distribution was made in the estate of Charles Sumner Young, deceased, distributing all of the property of the estate to the Bank of America, successor of the Security Trust Company of Bakersfield, the trustee we have already mentioned.

At a date not definitely fixed, James D. Young engaged A. C. Routhe to act as attorney for plaintiff in the estate and other matters, supplanting A. G. Reily who had been acting as attorney for her.

On March 27, 1930, James D. Young secured a second power of attorney from Alice L. Fisher and her husband. This instrument gave him broad powers in dealing with the property of the estate of Charles Sumner Young and was by its terms declared to be irrevocable.

On April 25, 1930, James D. Young borrowed three thousand dollars from plaintiff. Young gave plaintiff the following instrument:

"Los Angeles, California, April 25th, 1930.
"Miss Cora B. Young, Los Angeles, Calif.

"This is to acknowledge the receipt of $3,000.00 this day handed to me for general use incident to the formation of the Young Holdings Corporation (to be incorporated), and which above sum it is understood and agreed is to be later returned to you from the funds of said corporation; and this is to acknowledge our agreement that the above sum constitutes a loan and is to be repaid to you, as aforesaid.

"After organization, should you so request, this loan will be evidenced by note of the corporation.

"JAMES D. YOUNG
"Agent for Cora B. Young."

So far as we are advised, no note was given for this loan, and it remains unpaid.

Under date of May 2, 1930, A. C. Routhe wrote plaintiff a rather indefinite letter concerning "our business enterprise" in which he stated, "I have in mind, and will desire later to discuss with you, a plan for your protection against possible loss, or adversities."

On May 16, 1930, James D. Young obtained from plaintiff a general power of attorney, not confined to dealing with the property of the estate of Charles Sumner Young, deceased. This document was witnessed by A. C. Routhe.

On June 1, 1930, James D. Young wrote plaintiff a letter, in part, as follows:

"Dear Cousin Cora:

"Just a line to let you know we arrived here in fair shape and are once again at the task.

"We had a splendid talk with Mr. Dawson in his home which happens to be his office also.

"Stopped of course at the Foundation and many other places where we gained much information which will be of great benefit to us later on.

"So much to tell you and talk over upon our return.

"It looks very much to us like a plan was in the making, which will be of great interest and satisfaction to all. . . .

"Mighty glad that things in general are in good shape to continue on with our plans.

"Do not see how it would be possible to stop us now with your good help and our future outlook.

"I wish to take this opportunity to again thank you for the many splendid things you have done and to assure you again, that it is my intention and our desire, to follow thru to a successful conclusion. . . .

"With loads of love and best wishes from all of us always,
"JIM.

"P. S. The Routhes are sure fine people and square to a fault."

Under date of July 22, 1930, James D. Young wrote to plaintiff, in part, as follows:

"Dear Cousin Cora:

" . . . Since you have been away from us, I have thot much of the confidence you placed in me and have many times wondered at it and attempted to justify if I could, your evident trust in me.

"I consider that you accorded me an honor that few men or women could boast of and it is my intention to stay within the limits of that trust and protect you, while you are not here to do so yourself.

"Do not intend to burden you with business while you are on a vacation period with this exception—the property is in good shape and you have nothing to worry about nor to disturb you in any way.

"Cousin Alice is at Lakeside and well, Cousin Henry is feeling as well as usual and Mother and our family are all well now although we have all been somewhat under the weather.

"Would appreciate a note from you from some point along the way. Have a good time and take care of your health. Best of wishes always,

"With Love,
"JIM."

The foregoing letters are quoted as examples of protestations of love and affection and assurances of good faith made by the related individual defendants whereby they gained and retained the trust and confidence of plaintiff while they were despoiling her of all of her property.

In the meantime the Young Holdings Corporation, Ltd., a Nevada corporation, had been organized. As far as we can ascertain, none of the heirs at law of Charles Sumner Young were given any interest in this corporation. James D. Young was the president and manager of the corporation, and its principal stockholder.

Under date of September 21, 1931, Henry J. Young quitclaimed his interest in the estate of Charles Sumner Young to the corporation. Under date of September 28, 1931, Cora B. Young executed a similar quitclaim deed to her interest in the estate property. This deed was witnessed by James D. Young and was not acknowledged until April 8, 1932. On January 20, 1931, Georgia Lee Young had conveyed the same property to the corporation.

Defendant William E. Hanna testified concerning the arrangements with some of the heirs of Charles Sumner Young and their purposes, as follows:

"I had an agreement with Cora B. Young and Alice Fisher, it was a verbal agreement that I was to spend my own money. We would organize a corporation and we were to bring the interests of the Charles Sumner Young estate together and we were to use the profits of that corporation to carry out the will and the wishes of Charles Sumner Young as directed by Cora Young and Alice Fisher from time to time. I did not have that kind of agreement with Alice Fisher when I left Toledo. It was about the time we formed the Young Holdings Corporation that we had such an agreement. That agreement was then oral and with Cora B. Young and with Henry Young. I think there was some agreement in writing. That is my memory that there was; Mr. Blackburn, as attorney, took care of it. Mr. Blackburn was my attorney—he was not my attorney, he was attorney for the Foundation and I was attorney, in fact, for them. I think Mr. Blackburn

appeared for all the heirs and the representatives of the heirs in the quiet title suit, and the Foundation. He was employed by James D. Young only on behalf of Alice Fisher and E. K. Fisher and myself. I employed him to represent the Foundation. My authority was that I had power of attorney from the Clara Barton Sequoyah Foundation; I have it with me. Mr. Blackburn represented Cora B. Young. I never had any agreement with Jessie Fremont Young for any interest. I had no agreement with Jim Young.

"Q. Then none of your group, yourself, your wife, Georgia Lee Young or James D. Young ever had any agreement or assignment from Jessie Fremont Young?

. "A. They had one-half of her interest; a little over one-half of her interest; she was dead at that time."

In June, 1931, the Young Holdings Corporation, Ltd., and various other plaintiffs who had interests in the Kern County property formerly belonging to the estate of Charles Sumner Young, filed an action to quiet title to this property against the Bank of America National Trust and Savings Association, a corporation; the trustees under the will of Jessie Fremont Young, deceased; James D. Young as administrator with the will annexed of the estate of Jessie Fremont Young, deceased; the Clara Barton Sequoyah Foundation; James D. Young and Dorothy Young, his wife; Alice L. Fisher, Cora B. Young and Henry J. Young, as heirs at law of Jessie Fremont Young, deceased; Cora B. Young; Henry J. Young; Alice L. Fisher and E. K. Fisher, her husband; Georgia Lee Young; A. G. Reily and Florence A. Reily, his wife; and others. A. C. Routhe was attorney for the plaintiffs. The judgment quieting plaintiffs' title to the property is dated January 5, 1932.

According to the testimony of A. C. Routhe he became attorney for Cora B. Young some time prior to May 27, 1932, certainly in the latter part of 1931. One of his letters indicates he was advising her as early as May 2, 1930. In a letter discussing the bringing of the quiet title action, and written before it was filed, Routhe stated he was then the attorney for Cora B. Young. If he was not her attorney when the quiet title action (in which he was attorney for the plaintiffs) was instituted against her in June, 1931, he was her attorney when judgment was rendered against her in January, 1932.

James D. Young, under his powers of attorney, engaged attorneys to appear in the quiet title action for Alice L. Fisher, Cora B. Young and Henry J. Young. He also engaged an attorney to appear for Alice L. Fisher as trustee under the will of Jessie Fremont Young, deceased. He instructed the attorney he engaged to file disclaimers for these defendants. At that time, and prior thereto, the same James D. Young was the president, general manager and principal stockholder of the Young Holdings Corporation, Ltd., the principal plaintiff in the action.

About May 16, 1932, the Young Holdings Corporation, Ltd., sold and conveyed its fifty-six and one-third per cent interest in certain of the lands in Kern County, upon which were numerous producing oil wells, to the L. & B. Producing & Drilling Company for $35,000. Almost immediately after this money was received, a large portion of it was disbursed as follows: $10,000 to Mildred Hanna; $10,000 to James D. Young; $8,000 to Georgia Lee Young; $5,000 to A. C. Routhe and $500 to Mr. Blackburn. There was no pretense of paying this money out as dividends. Defendants, through the corporation, had gained the record title to very valuable oil lands and the needs of the noble Red Man had passed from their minds. They did not permit even one American Indian to cast lots with them for the garments. The heirs of Charles Sumner Young did not know that the money which had been a part of their inheritance had been received or was being divided.

Further facts concerning the dealings of defendants with the heirs, concerning the Kern County property, will be set forth, when necessary, in the consideration of the various grounds for reversal urged by defendants. We will, therefore, leave this story of chicanery for the tale of fraud and deceit by which plaintiff was tricked and defrauded out of her own property in Los Angeles and Orange Counties.

On November 26, 1930, Cora B. Young, by James D. Young, her attorney in fact, without any consideration, conveyed her Los Angeles County property to the Young Holdings Corporation, Ltd. This deed was recorded on May 6, 1932. On November 26, 1930, Cora B. Young, by James D. Young, her attorney in fact, without any consideration, conveyed her Orange County property to the same corporation. The copy of this deed in the record bears no evidence of its recordation.

As we have already observed, plaintiff at one time engaged A. G. Reily, attorney at law, to care for her interests in the estate of her deceased brother. After the defendant relatives appeared in the picture Reily was discharged and A. C. Routhe was engaged to act for her. Reily made demand on plaintiff for attorney's fees which he had earned prior to his discharge. As these fees were not paid he subsequently brought suit against her to collect them.

Early in 1932, plaintiff received a written demand for payment from Reily. She was alarmed over this development and consulted William E. Hanna about the matter. A few days later Hanna and James D. Young appeared with two quitclaim deeds and a letter, the last of which at least was prepared by her attorney, A. C. Routhe. The deeds quitclaimed her Los Angeles County and Orange County properties to the Young Holdings Corporation, Ltd. The letter prepared by her attorney, presented by her loving relatives, one of whom was her trusted attorney in fact, and at the same time president and general manager of, and principal stockholder in the grantee named in the deeds, deserves quotation in full because of the construction put upon it by defendants and their efforts to hide behind it. It is as follows:

"Los Angeles, California.
"April 19th, 1932.
"J. D. Young,
"404 Western Mutual Life Bldg.,
"321 West 3rd Street
"Los Angeles, California.
"My dear Sir:

"I have on various occasions, been threatened with suit and actions which would necessarily involve and encumber my various properties, and otherwise jeopardize my business activities, and for the purpose of avoiding the same, and placing my properties beyond the reach of such demands, and in furtherance of, and compliance with our mutual understandings and agreements concerning the same, I am herewith handing you Quit Claim Deeds to my various properties which are conveyed to the Young Holdings Corporation, Ltd., a corporation, which deeds are a confirmation of former conveyances made of the same.

"It is my understanding that the said company, in the taking of said conveyances, are to take care of the encumbrances, taxes, etc., and to help me personally, financially,

from time to time, from the returns thereof, and that at any time I shall need or require any specific lot or parcel thereof, for my personal use, while the same is held in the name of said company, that it will be reconveyed to me or to my order, subject to any encumbrance, tax, or charges against the same.

"You are hereby instructed, in case of suit, or action, or other claim or demands against me or my properties, to represent, claim and assert that the said properties are the properties of The Young Holdings Corporation, Ltd., and that I have, or claim, no interest therein. In all these matters I have entrusted my affairs to your care and management and I am thus advising you of my transactions with the said company for your personal information, and for my records and protection I will ask you to please note hereon your receipt, acceptance and understanding thereof.

"Respectfully yours,
"Cora B. Young.

"I am in receipt of the original of the above and I am informed of your wishes and desires and will endeavor to carry out the said plan.

"J. D. Young"

Miss Young signed and acknowledged the deeds and also signed the letter.

There followed a systematic and continued campaign of fear, instilled into the mind of plaintiff by all of the individual defendants; fear of losing all her property as a result of the Reily suit; fear of criminal prosecution. She was told that both results might be avoided if she stayed away from Los Angeles. Many letters written in the course of this campaign are in the record. There is much testimony concerning it. While the letters were clearly written for the purpose of alarming plaintiff and causing her to stay away from her home in Los Angeles, they also contained messages of affection and assurances that her interests were being cared for faithfully by her loving relatives, by her faithful attorney in fact, and her attorney at law. For illustration we quote from two of these letters. The first, written, probably in June, 1933, is as follows:

"Dear Corrine:

"Fear you have been a bit unsettled from reading your last note.

"*You have nothing on us,* for if ever there was a vicious person lived—it's Reily's new counsel; no manners—and if he does half what he says he will do to you and all!

"Your good name, you have enjoyed won't be *worth a nickel* when he sees you. He is just the type to care little about anything; the kind that will laugh you in the face when speaking of *you* and your *high ideals,* and your culture; says he will put you in jail as soon as he can locate you etc. and you can believe me when I say, he is of the *dirty* kind.

"I have never met such a person before, just what you would expect from Reily. Then with old Jew Kline it is one wonderful set up; a pretty *good one* to be away from—and so far to have things still in *your hands* with out losing so much as a *thin dime!*

"It's worth thinking about—and being thankful about.

"I know you are lonely and we all think *much* about it, but on the other hand you are going and seeing things (even to the big fighters etc)

"(*Watch your step*) and much of your life, dear, has been spent in that way. You, as hard as it will be to see it, have been as sure as the world-blessed. All about you and us, have people *lost there all*—health, sight, hearing, are yours to-day.—Let us all make the best of it. Yes you are game, and I salute you but the fight isn't over—

"Now my sincere love to you—enjoy hearing from you, and know you have enjoyed your visits to the various colleges for that is your life. Be Good Cheerup—and love to you

"MILDRED"

The other letter was written by William E. Hanna in July, 1933, and contains the following:

"Dear Cousin Cora:

" . . . Sometimes after reading your letters I think the best thing for you to do is come back; face the music alone and find out just what it all amounts to. It seems impossible to satisfy you, and no amount of sacrifice on our part can seem to allay your feelings.

"Mr. Donohue, Reily's attorney says he will have you back if he can locate, (and says he is tracing you) and will send you over 'for transferring property to avoid creditors,— falsifying income tax returns, fraud, etc' As I have repeatedly told you we are taking care of matters here and will beat them all *if* that is what you want, but if that is *not* what you want and you believe you are taken advantage of etc.—then

let us know enough in advance so we can prepare to *get out* as soon as you return, and you *come back* and face the music yourself. . . .

"I know at times things seem discouraging to you, and you are alone. But enjoy the fine health you have, spend for the things you enjoy; go to Europe, if that is your desire, and *live,* for;—if you so desire we *will* carry on and better times are ahead. But if you *want* to come back and stand alone just let us know. I know all want *you* to do *only* what you will be *happy* in doing.

"Love,
"BILL."

As a result of this campaign, plaintiff stayed away from her home on several occasions, and on some of them for considerable periods of time. She was absent when the L. & B. Producing & Drilling Company sale was made and the money distributed. It is urged that this campaign of fear was waged by defendants to make plaintiff's dependence on them more absolute and to keep her away from her home and friends so that she would not learn of their faithlessness and duplicity.

Reference to a single instance of the methods used by defendants should not be out of place here. Plaintiff had planned a vacation to start during the latter part of February, 1933. On February 16, 1933, a male voice addressed her over the telephone saying: "I am the foreman of the Grand Jury. . . . I would like to make an engagement to meet you tomorrow. I suppose you are a very busy woman, but I would like to have a chance to talk with you tomorrow." Plaintiff was alarmed and excited and telephoned A. C. Routhe telling him of the receipt of this message. He told her that James D. Young would call on her the next morning. At about 9:30 o'clock the next morning William E. Hanna called at her home with an automobile. Plaintiff described his arrival as follows: "He grabbed up my grips and said, 'You are going away tonight', and we left the house without my paying my hotel bill." Hanna took plaintiff to several places in Los Angeles, Pasadena and Eagle Rock during that day, staying only a short time at each and finally put her on a train leaving Los Angeles that evening. She was gone about fifteen months. During her absence a deed of trust was foreclosed on one of her properties which she had deeded to the Young Holdings Corporation, Ltd.

Defendants compromised the Reily suit for $10,000. In settlement of this sum they deeded him two of plaintiff's lots in Los Angeles County and took an assignment to the Young Holdings Corporation, Ltd., of the $10,000 judgment against plaintiff. From the proceedings on motion for new trial we may conclude that the Young Holdings Corporation, Ltd., had execution issued on this assigned judgment and attempted to levy on plaintiff's property in 1936 after the judgment was entered in her favor in the instant case. We should add that there is no intimation in the record of any misconduct on the part of A. G. Reily.

In September, 1933, and during the absence of Cora B. Young, the Young Holdings Corporation, Ltd., brought suit in the Superior Court of Los Angeles County against Cora B. Young and A. G. Reily to quiet title to her Orange County and Los Angeles County properties. Cora B. Young appeared by a disclaimer which was verified by James D. Young as her attorney in fact. James D. Young also engaged an attorney to file it for her. We are informed that A. C. Routhe was the attorney for the Young Holdings Corporation, Ltd., the plaintiff, of which James D. Young was the principal stockholder, president and manager. Judgment for the plaintiff was entered in September, 1933.

Defendants first urge that the judgments in the two quiet title actions wherein the titles to the properties in question here were quieted in the Young Holdings Corporation, Ltd., are final and conclusive and a bar to recovery by the plaintiff and the intervener here.

The trial court found that defendants conspired together to defraud the heirs of Charles Sumner Young out of their interests in the estate properties, and to defraud Cora B. Young out of her other property. Many fraudulent acts were found of which we have indicated a number. The evidence supporting the findings of conspiracy and fraud is overwhelming. The two quiet title actions were steps in the conspiracy and were only two of the many acts of fraud by which defendants accomplished their purpose.

The conduct of defendants in the two quiet title actions amounted to extrinsic fraud. (*Jeffords* v. *Young,* 98 Cal. App. 400 [277 Pac. 163]; *Clavey* v. *Loney,* 80 Cal. App. 20 [251 Pac. 232]; *Baker* v. *Baker,* 217 Cal. 216 [18 Pac. (2d) 61]; *Ringwalt* v. *Bank of America etc. Assn.,* 3 ('al. (2d) 680 [45 Pac. (2d) 967].)

The heirs at law of Charles Sumner Young were never really represented in the quiet title actions. Their attorneys were chosen by James D. Young, one of the conspirators, the moving spirit in the fraud who was their attorney in fact and the one who principally benefited by the judgments in favor of the Young Holdings Corporation, Ltd. A judgment obtained in such an action, through extrinsic fraud, may be attacked in an equitable action brought for that purpose. (*Estudillo* v. *Security Loan etc. Co.*, 149 Cal. 556 [87 Pac. 19]; *Bacon* v. *Bacon*, 150 Cal. 477 [89 Pac. 317]; *Parson* v. *Weis*, 144 Cal. 410, 419 [77 Pac. 1007].)

The Young Holdings Corporation, Ltd., obtained the property without consideration. The individual defendants who committed the fraud could not cloak "themselves in the garb of a corporation" and through it retain the benefits of their fraud. (*Raynor* v. *Mintzer*, 67 Cal. 159 [7 Pac. 431].) The individual defendants were all engaged in the fraudulent transaction and all of them benefited by it. As they violated every rule of good morals, good faith and equity in dealing with their victims neither they nor their corporation can retain the fruits of their wrongdoing, which fruits were gained by a series of acts amounting to repeated and flagrant breaches of trust. (*Smith* v. *Goethe*, 147 Cal. 725 [82 Pac. 384]; *Tomblin* v. *Hill*, 206 Cal. 689 [275 Pac. 941]; *Rosemead Co.* v. *Shipley Co.*, 207 Cal. 414 [278 Pac. 1038].)

Defendants next urge that a judgment rendered in one county cannot be invalidated in another county. This argument must of necessity be confined to that portion of the judgment which deals with the Kern County property, title to which was quieted by the Kern County superior court. Title to the balance of the property was quieted by the Los Angeles County superior court, where the instant action was tried and judgment entered.

The principal purpose of this action is to establish that defendants gained title to the property in question through fraud and deceit; that they hold the property in trust for the plaintiff and the intervener; to compel defendants to execute the trust by reconveyance of the property to its rightful owners.

The argument that this action should have been commenced in Kern County is answered by the provisions of section 392 of the Code of Civil Procedure, *Herd* v. *Tuohy*, 133 Cal. 55

[65 Pac. 139], and *Kimball* v. *Tripp*, 136 Cal. 631 [69 Pac. 428]. In the Herd case it was said:

"As to the jurisdiction of the court, there can be no serious question. The superior court is vested by the Constitution (art. VI, sec. 5) with jurisdiction over 'all cases in equity'; and cases of this kind—that is, for relief against judgments on the ground of fraud in their procurement—constitute a familiar and well-established head of equity jurisdiction. (Freeman on Judgments, sec. 484a; Daniell's Chancery Practice, 1584, 1585.) Nor—with an exception to be noted presently—is this jurisdiction vested in any particular superior court or courts. Every superior court—with the exception alluded to—has jurisdiction of all equity cases that may be brought in it."

The exception noted is contained in section 392 of the Code of Civil Procedure. This section requires actions to quiet title to real property to be commenced in the county in which the property or any part of it is situated.

In the Kimball case, *supra,* the Supreme Court said:

"As to the question of jurisdiction, assuming, without deciding, that the provisions of the code and of the Constitution cited apply to cases of this kind, yet under them the action may be brought in any county in which part of the land affected by the action is situated. (Const., art. VI, sec. 5; Code Civ. Proc., secs. 78, 392.)"

In the instant case the property involved was situated in Los Angeles, Kern and Orange Counties. This fact gave the Superior Court of Los Angeles County jurisdiction of the action under the clear provisions of section 392 of the Code of Civil Procedure, if that section be considered applicable to the case at bar. If not, then the Superior Court of Los Angeles County had jurisdiction under its constitutional equity powers.

Defendants next urge that if it be assumed that, due to the findings of fraud and lack of notice, the judgment in the Kern County quiet title action is not binding on plaintiff and on intervener, it must be allowed to stand against the successors in interest of Alice L. Fisher because there is no finding that she was without notice of the fraud.

As we have already observed, James D. Young was attorney in fact for Alice L. Fisher, at the time the Kern County quiet title action was instituted and the judgment rendered, and also at the time he, as such attorney in fact, conveyed her

interest in this property to his mother. As he was the principal stockholder of the Young Holdings Corporation, Ltd., he was the principal beneficiary of the judgment favorable to that corporation. He engaged an attorney to represent Alice L. Fisher and instructed him to file a disclaimer for her.

An agent is prohibited from entering upon any transaction with the property which is the subject matter of the agency, in which transaction he has an individual interest, without a full and fair disclosure to his principal. (*California National Supply Co.* v. *Black*, 48 Cal. App. 122 [191 Pac. 715].) In acting for his principal he is bound to the same standard of integrity and good faith as is a trustee. (Sec. 2322, Civ. Code; *Williams* v. *Lockwood*, 175 Cal. 598 [166 Pac. 587].) In *Curry* v. *King*, 6 Cal. App. 568 [92 Pac. 662], it was said:

"The relation of the plaintiff to the defendant, as well established by the facts and assumed by him throughout the transaction, was that of an agent, and consequently fiduciary in its nature. He was, as her agent, charged in full measure with the duty of good faith in his dealings with her touching the subject-matter of his authority as such agent. The proposition here stated is so well and conclusively settled that the citation of authorities upon the subject would seem to involve only a waste of time. The animating principle of the proposition is that no one should nor will be permitted to enjoy the fruits of an advantage taken of a fiduciary relation, whose dominant characteristic is the confidence reposed by one in another. The act of an agent, within the scope of his authority, is the act of his principal, and hence the authority of an agent is so fraught with responsibility and grave concern to his principal, dealing as it does with the property rights of the latter, that it proceeds out of the highest considerations of confidence, which, the principles of equity demand, must be preserved to its utmost in transactions involving the exercise of such authority. Therefore, an agent will not be allowed to deal in his own behalf with his principal with reference to the subject-matter of the agency, unless he makes full, complete and honest disclosure of the truth of the transaction. He is bound to treat with his principal concerning the property over which he has been vested with authority in the utmost good faith, and so religiously does equity require adherence to this rule that a transaction between them as to the property whereby the agent acquires the ownership thereof, is, upon its face, deemed by the law to be fraudulent.

. . . In *Rubidoex* v. *Parks,* 48 Cal. 215, the court (we quote the syllabus) lays down the rule as follows: 'The agent and principal are not absolutely prohibited from dealing with each other in respect to the subject-matter of the agency or trust; *but in all their dealings with each other, the utmost good faith is required, and the burden of proof is on the agent to show affirmatively that he acted in good faith, fairly and honestly.'* (Italics are ours.)''

From the facts before us, and under the rules of law just announced, it follows that the burden of proving fair dealing and knowledge on the part of Alice L. Fisher rested on defendants. They failed to meet this burden and failed to overcome the presumption of bad faith and fraud on their part. In the absence of a finding in their favor the law presumes them guilty of fraud, which includes failure to inform their principal of their actions which resulted in their acquiring her property. As the law places on them the burden of producing evidence of notice and good faith they cannot complain of the lack of a finding which of necessity must have been against them. (*Consolidated Irr. Dist.* v. *Crawshaw,* 130 Cal. App. 455 [20 Pac. (2d) 119]; 24 Cal. Jur. 944; 10 Cal. Jur. Ten-year Supp. 740, and cases cited.)

Defendants next urge that the judgment should be reversed because the third amended complaint fails to state a cause of action against them. This argument is made, first, on the ground that it is not alleged that either plaintiff, Alice L. Fisher or Henry J. Young, had a defense on the merits to the quiet title actions, and, second, that courts are loath to set aside judgments of other courts in other actions when those judgments have become final.

It is true that there is no direct allegation, in so many words, in the pleadings, that any one of the three parties had a defense to either quiet title action. However, the facts showing the conspiracy and constituting fraud and deceit, and facts showing the faithlessness of the defendants, are pleaded in great detail. These allegations clearly show that the three persons named had adequate defenses on the merits to the Kern County quiet title action and that plaintiff had an adequate defense to the Los Angeles County quiet title action, had these facts been then known to them. It is true that one court will seldom set aside a final judgment of another court of equal jurisdiction except in a case where extrinsic fraud is proven. In such a case there is, and should be, no hesita-

tion to set aside a judgment obtained by the extrinsic fraud of the successful party.

Defendants next urge that the evidence offered on behalf of plaintiff was not sufficient to sustain the judgment in her favor in this action. This argument is again divided into two sections, the first dealing with the Kern County property, and the second with the Los Angeles County and Orange County properties. Before considering these arguments in detail it should not be out of place to say that outside of fiction we have never seen nor heard a story disclosing such a sequence of trickery, fraud, deceit and breach of trust as that presented by the record in the instant case. The judgment rendered is just. If it were to be criticized at all, it would be upon the ground that it did not go far enough in restoring to plaintiff and intervener that which defendants wrongfully took from them. In view of the provisions of section 4½ of article VI of the Constitution defendants would have to show us a grievous error of law of great magnitude to convince us that such an error had resulted in a miscarriage of justice sufficient to cause us to reverse the judgment.

Defendants argue that as far as the Kern County property is concerned, plaintiff knew that it was to be conveyed to the Young Holdings Corporation, Ltd.; that she voluntarily executed her deed to it; that she therefore cannot complain of her own actions that produced the result which she contemplated and intended, namely, of that corporation owning her interest in the Kern County property. We have already pointed out in great detail the fraudulent acts of defendants which produced this result. We will not repeat the review of that evidence. It should be sufficient for us to say that where a deed to property is obtained through a conspiracy and the fraud of those who benefit from it, the defrauded grantor may attack it and a court of equity may invalidate it.

As an adjunct to the foregoing argument the defendants point to one of the by-laws of the Young Holdings Corporation, Ltd., which is as follows:

"Board of Directors shall maintain by appointment, subject to removal at will, a special committee to be designated as the Charles Sumner Young Founding Committee, who shall pass upon, make plans for and otherwise advise with the Board of Directors in the disbursement of the funds, specially delegated by the Board to the said Funding Committee

in carrying out the plans and ideals of the Honorable Charles Sumner Young, deceased, and no expenditures shall be made by the said Board of Directors of funds allocated to said funding committee, except upon a majority vote of said funding committee, which shall comprise of five members of which the President shall be *ex-officio* head or chairman. Any stockholder shall be eligible to appointment upon said committee.''

Defendants urge that the foregoing by-law shows their good intentions, and their desire to aid the American Indian. If they ever entertained any such good intentions they were never carried out. They must have reserved such good intentions for use as proverbial paving blocks for the streets of that unexplored realm for which no righteous soul departs and from which no wicked soul returns. The individual defendants were the chief beneficiaries from the property formerly belonging to the estate of Charles Sumner Young. Not one of them proved there was a drop of Indian blood flowing in his veins.

██ Defendants' argument to the effect that plaintiff cannot maintain this action as it affects her Los Angeles and Orange County properties is based on her letter of April 19, 1932, to J. D. Young (which we have quoted in full) in which she virtually admits that her conveyances to the Young Holdings Corporation, Ltd., were executed for the purpose of defrauding her creditors. We have already detailed the circumstances under which this letter was written and those deeds were executed.

The rule that a party coming into a court of equity must come with clean hands is firmly established. Where a plaintiff is a party to an act which is done to defraud her creditors, equity will generally deny her any relief but will leave her and her adversary in the position in which equity found them.

There is an important exception to the foregoing rule that is controlling here, namely, that a grantee who by fraud has induced his grantor to convey to him property to defraud the grantor's creditors cannot hide behind the act which was induced by his own initial fraud. *Chamberlain* v. *Chamberlain*, 7 Cal. App. 634 [95 Pac. 659], was such a case. It was there said:

''Even conceding that in making the conveyance plaintiff was influenced somewhat by a desire to preserve his property from sequestration by the creditors of the corporation, still

giving full credit, as we must, to the evidence favorable to the judgment of the court below, we cannot find in that circumstance alone sufficient reason to disturb the findings. We are bound to accept as true that E. J. Chamberlain importuned plaintiff to convey the property to her upon the assurance that she would reconvey it on demand, that she made the promise with the intent to deceive him, and that he had confidence in her representations, and therefore executed the deed. It follows, we think, upon the clearest principles of equity that she could not take refuge behind the pretense that in yielding to her solicitations he committed a wrong against others, thereby depriving him of any redress for her gross misconduct. The law is more indulgent to human infirmity and less tolerant of deliberate and obtrusive depravity. A cannot lay a trap for B, secure his confidence, induce him to make a conveyance of his property in the expectation that it will be returned, and thereafter retain the fruits of his perfidy on the ground that B too readily yielded to temptation to save himself at the possible expense of creditors. The greater offense of the tempter overshadows and renders innocuous the weakness of the one of whom advantage is taken.'' (See, also, *Anderson* v. *Nelson,* 83 Cal. App. 1 [256 Pac. 294] ; *Grider* v. *Manisera,* 11 Cal. App. (2d) 355 [53 Pac. (2d) 982] ; *Tognazzi* v. *Wilhelm,* 6 Cal. (2d) 123 [56 Pac. (2d) 1227].)

Defendants further urge that neither plaintiff nor intervener has offered to do equity and restore the benefits which they received from defendants. They point out that the evidence shows that defendants expended about $58,000 on the affairs of the Young Holdings Corporation, Ltd., and made some payments to Henry J. Young and perhaps to plaintiff. It might not be out of place to inquire how money spent on behalf of the Young Holdings Corporation, Ltd., was of any benefit to either the plaintiff or to Henry J. Young. They were not stockholders in that company. It seems to have been organized as one of the final steps in the conspiracy to denude plaintiff and Henry J. Young of all their properties and to be used as a cloak behind which defendants would attempt to hide their individual acts of fraud. Why either plaintiff or the estate of Henry J. Young should be required to repay money spent on the affairs of a corporation organized for the purpose of holding property wrongfully taken from

them and consummating the conspiracy and fraud of the individual defendants, does not appear.

Further, a trustee is required to account to his beneficiary for the use of trust funds. This, defendants did not do, except to make the very general statement that there had been expended about $58,000 in recovering the estate property and placing its title in the Young Holdings Corporation, Ltd., and other like expenses. If they had expended any money which their contracts with the brother and three sisters of Charles Sumner Young did not require them to expend, it was their duty to prove such expenditures. Defendants explained this failure of proof by saying that their books and records had been destroyed in the Montrose flood. The trial judge, being the sole and exclusive judge of the credibility of the witnesses and the weight and sufficiency of their evidence, had full authority to disbelieve this evidence of the amount expended and to reject it as untrue.

Defendants urge that they had advanced money to Henry J. Young and had made personal loans to him not connected with his interest in the property of the estate of Charles Sumner Young, deceased. It is not clear that these loans were of such a character that they could be offset against any recovery in this action. At best they were merely personal loans. If any of the defendants were legitimate personal creditors of Henry J. Young, their remedy is a claim presented to his executor or administrator.

Defendants next argue that no express trust was either alleged or proved. In this we agree with them. Plaintiff and intervener do not dispute this conclusion. The trust was an involuntary (constructive) trust as title to the property was acquired by fraud. (Secs. 2215, 2217, 2223, 2224, Civ. Code; 25 Cal. Jur. 145, sec. 19, and cases cited; 11 Cal. Jur. Ten-year Supp., p. 6, sec. 19, and cases cited.) That it was not a charitable trust follows from what we have just said.

Defendants urge that their plea of the statute of limitations should have been sustained. The trial court found that the fraud was discovered by plaintiff and Henry J. Young less than three years prior to the institution of this action and the filing of the complaint in intervention. There is evidence in the record to sustain this finding. Further, the only pleading of plaintiff in the record is the third amended complaint. The original complaint and its date of filing are not before us. Where the plea of the statute of

limitations is interposed, a record that does not contain the date of filing the original pleading is defective. (*Dougall* v. *Schulenberg,* 101 Cal. 154 [35 Pac. 635] ; *Sullivan* v. *Shannon,* 25 Cal. App. (2d) 422 [77 Pac. (2d) 498].) Under such circumstances we must presume the action was commenced in time.

Defendants urge that the trial court erred in refusing to grant their motion for new trial. At the hearing of this motion they produced a transcript of a part of the testimony given by plaintiff on March 31, 1936, after the entry of the judgment in this action, incident to a motion to recall an execution in the case of *A. G. Reily* v. *Cora B. Young,* (21 Cal. App. (2d) 181 [68 Pac. (2d) 1015]). They maintain that her testimony there given conflicts with her evidence in the instant case, which formed the foundation for some of the findings in this case and that the granting of a new trial was mandatory under the rule announced in *Thomas* v. *Fursman,* 177 Cal. 550 [171 Pac. 301], and 20 Cal. Jur. 99. We have studied the portions of plaintiff's testimony in the Reily case upon which defendants rely and can find nothing in it sufficiently conflicting with her evidence and the findings in the instant case to have required the granting of the motion for new trial.

Lastly, defendants urge that the evidence was insufficient to support many vital findings of the trial court and that certain findings are contrary to the evidence. They specify sixteen such findings. We have laboriously set forth a rather careful summary of the evidence supporting the judgment in this case. It fully supports those findings necessary to support the judgment. If other findings are not supported by the evidence we need not concern ourselves with them nor consider them in detail because they become immaterial as the judgment is fully supported by other findings. (24 Cal. Jur. 942.)

The judgment is affirmed.

Barnard, P. J., concurred.